UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 JUN 21  P 1: 55

CASE NO.:_____

CLERK'S OFFICE
AT GREENBELT

____90____ DEPUTY

UNITED STATES OF AMERICA,
ex. rel. JOHN J. MURTAUGH,
STATE OF FLORIDA,
ex. rel. JOHN J. MURTAUGH,
STATE OF MARYLAND,
ex. rel. JOHN J. MURTAUGH,

                        Plaintiffs/Relator,

v.

ACELL, INC.,

                  Defendant.

MJG 13 CV 1820

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. 3730(b)(2)**

_____/

### COMPLAINT FOR DAMAGES AND OTHER RELIEF
### UNDER THE FALSE CLAIMS ACT (31 U.S.C. §3730) and
### STATE FALSE CLAIMS ACTS

On behalf of the UNITED STATES OF AMERICA and the states of FLORIDA and MARYLAND, Plaintiffs, Plaintiff/Relator JOHN J. MURTAUGH (hereinafter "MURTAUGH" or "Relator"), files this qui tam complaint against Defendant, ACELL INC. (hereinafter "ACELL"), pursuant to 31 U.S.C. §3729, *et seq.*, as amended as well as pursuant to the named States' False Claims Acts to recover all damages, penalties, and other remedies available under the False Claims Act and State False Claims Acts:

## I.      INTRODUCTION

### A. Federal and State Law Claims

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the named States in connection with the systematic misbranding, illegal marketing and kickbacks by ACELL in violation of the False Claims Act, 31 U.S.C. §3729

et seq. ("FCA"), Federal Anti-Kickbacks Statutes ("AKS") 42 USC 1320 (b)(2) and the named States False Claims Acts, more specifically, the Florida False Claims Act, Fla. Stat. §68.081 et seq. and the Maryland False Health Claims Act, Subtitle 6, §2-601 et seq., (hereinafter referred to collectively as the State FCA laws).

2.      Pursuant to the FCA, AKS and State FCA laws, Relator seeks to recover, on behalf of the United States of America and the named States, damages, civil penalties and attorneys fees arising from false or fraudulent claims that Defendant submitted or caused to be submitted to government funded health insurance programs based upon Defendant's practices as more fully described herein.

3.      Relator alleges that as the direct, proximate, and foreseeable result of ACELL's misbranding, illegal remuneration or kickbacks and deceptive promotion of its products for procedures for which they did not have an indication, ACELL knowingly caused health care providers to submit false claims for reimbursement or payment to Medicare, Medicaid, the Federal Employees Health Benefits Program ("FEHBP"), the managed care component of the United States department of Military Health Systems (TRICARE), the Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA), and the Civilian Health and Medical Program of the Uniformed Service (CHAMPUS), as well as other government funded insurance programs.

4.      Despite the fact that Defendant was made aware of this situation by Relator, and instead of making the necessary changes to avoid such pervasive fraud in the future, Defendant has simply continued to misbrand and falsely market its products resulting in additional bills to Medicare, Medicaid and other government agencies and healthcare programs.

5.      The end result of ACELL's actions and related false claims is the unjustified and illegal enrichment of Defendant, detrimental injury of patients, and the corresponding loss of millions of dollars of taxpayer's funds.

6.      On behalf of the United States of America and the named States, Relator seeks to recover these damages as well as civil penalties arising from the false claims that Defendant caused to be submitted to the United States and the named States.

## II.      PARTIES

### A.    The Relator

7.      Under the FCA and State FCA laws, a person with knowledge of false or fraudulent claims against the government, known as a "Relator," may bring an action on behalf of the United States of America and the States.

8.      Relator John J. Murtaugh was hired in August 2011 as a sales representative for ACELL.  He left ACELL in January of 2013.  Prior to working at ACELL, Relator spent three years as a hospital sales representative for Smith & Nephew selling advanced wound care products and orthopedic medical devices.

9.      Relator, John J. Murtaugh, graduated from the University of Central Florida in August of 2000 with a Bachelors of Science in Business Administration, majoring in marketing.

10.     Relator received training and instruction at numerous locations from several ACELL corporate representatives, which included sales management, the training department, product managers, and the marketing department.

11.     Relator raised his concerns about ACELL's practices on several occasions to numerous representatives of the company, to no avail.

12.     None of the allegations set forth in this Complaint are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from news media.  Rather, they are the independent declaration of the Relator.

13.     Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B).

**B.     The Defendant**

14.     ACELL, Inc. is a privately held company headquartered in Columbia, Maryland. The current CEO is James DeFrancesco and the President is Rodney Bosley.  ACELL employs sales representatives, known as territory managers, throughout the United States.

15.     According to their website, ACELL's primary business is the manufacturing and sales of extracellular matrix (ECM) products to repair and remodel damaged tissues in a broad range of applications.

**III.     JURISDICTION AND VENUE**

16.     Jurisdiction is proper in this Court because Relator seeks remedies on behalf of the United States for multiple violations of 31 U.S.C. §3729.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C.§1367(a).

18.     Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C.§3730(b)(2)

19.     This Court has personal jurisdiction over Defendant because it is headquartered in the District of Maryland, transacts business in the District of Maryland, and because some of the acts complained of herein occurred in the District of Maryland.

20.     Venue is proper in the District of Maryland pursuant to 31 U.S.C.§3732(a) because Defendant transacts business in the District of Maryland, and because the acts alleged herein to be in violation of 31 U.S.C.§3729 occurred in the District of Maryland.

## IV.     NATURE OF THE CASE

21.     ACELL manufactures and sells products made from harvested porcine (pig) bladder. The products are considered medical devices and were approved through the FDA 510k process based upon already-approved or predicate devices.

22.     In addition to ACELL, there are numerous other manufacturers who make and sell similar products with more extensive FDA approved indications.   ACELL has not undertaken steps toward regulatory approval of its products for many of the indications which it currently promotes its products.

23.     In order to compete in the market, ACELL utilizes deceptive and misleading promotional practices which create the impression that ACELL products are intended for use in, or approved for, applications where they simply are not approved. These promotional practices, taken together, amount to misbranding ACELL's products. *See* 21 U.S.C. §352(f) and 21 C.F.R. §801.4.

24.     Shortly after Relator was hired by ACELL to market and sell their products, he became aware that the company's central philosophy was to sell by any means necessary.

25.     Relator instantly became concerned over the company's promotional practices and voiced these concerns with his supervisors.   Relator's concerns were in part due to potential

violations of state and federal laws as well as the propensity for the practices to confuse or mislead physicians. Relator was also concerned that patient safety was at risk by pushing products into unapproved applications.

26.     Relator's experience with ACELL's deception began at his very first job interview with Regional Manager Matt Berryman in Miami, Florida in August of 2011. During Relator's interview, Mr. Berryman showed Relator numerous patient "cases" or visual examples of the use of ACELL products on his iPad.

27.     One of the cases, entitled "HEAD WOUND STAPH," depicted a patient with a head wound which was being treated at Wilford Hall Air Force Base. Mr. Berryman demonstrated how MatriStem Surgical Matrices were applied to the wound on the back of the patient's head and how it improved healing.

28.     Mr. Berryman showed Relator several more cases where MatriStem Surgical Matrices were used all over the body. When Relator asked Mr. Berryman what the FDA approved indications were for MatriStem, Mr. Berryman replied, "we have an indication for 'soft tissue repair', so we can be used literally anywhere." As Relator later learned, ACELL does not have an indication for 'soft tissue repair,' and the cases that Mr. Berryman demonstrated were, in fact, unapproved uses for the products.

29.     Realtor attended new hire training at ACELL's home office in Columbia, Maryland on August 30-31, 2011. During training, new hires were consistently trained on off-label or unapproved uses of MatriStem devices without the new employees' knowledge. The purpose of the training was to instruct new hires on how to promote ACELL products to physicians.

30.     The new hire training binder that Relator received at the two-day sales training contained numerous examples of the misbranding campaign by ACELL. The training was attended by several Regional Managers, Area Managers, Product Managers and Marketing Department members from ACELL.

31.     ACELL's training manual recommends using MatriStem Surgical Matrices (RS, PSM, and PSMX) on extremities and for external use.  However, the indications for these products are limited to urological, gynecological, and gastroenterological anatomy.

32.     Another example of the misbranding of MatriStem products was the promotion for use in reinforcing an anastomosis, a complicated surgical procedure which joins together two hollow organs to restore continuity after resection, or to bypass an un-resectable disease process.

33.     Emails and case presentations from ACELL demonstrate wrapping the bowel with MatriStem Surgical Matrices.  However, MatriStem Surgical Matrices are not indicated to reinforce an anastomosis or any other staple line or suture line.

34.     In spite of not having an indication to reinforce the staple line or suture line, Director of Sales Tres Riley insisted on a "Bladder Matters" conference call on June 22, 2012, that the MatriStem Surgical Matrices **are** indicated to reinforce an anastomosis.

35.     Specifically, Tres Riley, Sales Representative Cristina Citino, Area Manager Jeff Klecatsky, and Product Manager Arjun Ishwar recommended to sales representatives to sell this off-label application of ACELL's products to surgeons.  They misled the sales force by stating that ACELL's MatriStem Surgical Matrix RS, PSM and PSMX were indicated for this procedure.  Sales representatives from ACELL repeatedly promoted these products to surgeons for such uses and mislead surgeons into believing the products were approved.

36.     Protocols provided by ACELL for this procedure include mixing MatriStem MicroMatrix with saline and using this slurry in conjunction with MatriStem Surgical Matrices. Sales representatives from ACELL repeatedly promoted these products to surgeons for exactly such uses.  However, MatriStem MicroMatrix is indicated "for topical use only".

37.     Numerous area managers, regional managers and other departments within ACELL have distributed protocols for off label uses that are unproven and unsafe, such as utilizing MatriStem products to wrap nerves and also utilizing MatriStem topical products internally around vital organs.

38.     ACELL disseminated its campaign materials to sales representatives via PowerPoint presentations distributed across the country directly by sales management.

39.     Specifically in Relator's experience, Darren Doerr, Area Manager for Florida, emailed sales representatives on a consistent basis urging sales representatives to promote MatriStem products for off-label indications.   Relator believes similar emails and corporate directives were provided throughout the country.

40.     In an email from Darren Doerr to sales representatives on September 10, 2012, Mr. Doerr discusses the off-label use of MatriStem MicroMatrix and also MatriStem Surgical Matrices RS, PSM and PSMX.

41.     The presentation attached to his email included protocols and presentations on how to sell MatriStem MicroMatrix for internal use.  The presentation demonstrated how to mix MatriStem MicroMatrix with saline and use it for various internal off-label procedures. MatriStem MicroMatrix has an IFU or instructions for use that clearly states "for topical use only."  The email was sent to the entire Florida sales team as a "learning moment" and was copied to Regional Manager Matthew Berryman.

42.     A presentation entitled "Podiatry" was posted on the ACELL DropBox account for all sales representatives to access and use for promotional purposes.  Arjun Ishwar, ACELL's Product Manager instructed sales representatives to use this presentation to promote MatriStem products on lower extremity wounds.

43.     The "Podiatry" presentation contained a picture which demonstrates using "MatriStem" on a lower extremity wound.  This presentation, along with other ACELL promotional items repeatedly use the generic term "MatriStem" or "MatriStem sheets" in place of the actual products [MatriStem Surgical Matrix RS, MatriStem Surgical Matrix PSM, and the MatriStem Surgical Matrix PSMX] because the actual products used are not indicated or approved for wound care.

44.     By using generic, ambiguous terms instead of the names of the actual products, ACELL created the false impression that its products were approved for uses which they are not approved.

45.     The actual product used on the wound in the podiatry presentation was MatriStem Surgical Matrix PSMX ("6-layer PSMX"), which is not indicated for wounds and is limited to urological, gynecological and gastroenterological anatomy.

46.     The actual names of the devices MatriStem Surgical Matrix RS, PSM and PSMX have been removed from numerous other cases and replaced with the words "MatriStem" or "MatriStem Sheets" in order to hide from the customer which actual product is being used.  These case studies were used nationally to promote ACELL products.

47.     The folder in the ACELL DropBox entitled "Presentations" included well over 100 case studies and presentations that demonstrated off-label use of ACELL products.  The

company provided this information to all ACELL sales representatives for promotional purposes in discussing procedures with physicians.

48.     These presentations were reformatted and standardized in the spring of 2012, in order to deceive customers as to which product was actually used and to demonstrate outcomes achieved by using ACELL products in off-label or unapproved procedures.

49.     Relator witnessed numerous occasions where these materials were provided to physicians in an attempt to promote ACELL products for unapproved uses.

50.     Sales Representatives, including Relator, were routinely introduced to these cases via "Bladder Matters" conference calls.

51.     Employees were routinely alerted on the Bladder Matters conference calls by Director of Sales Tres Riley that these cases were for "our use" and would be "up on DropBox when you need them".

52.     In an email to the national sales force, Nicole Carmon in the Marketing Department confirmed that these presentations were provided as sales materials and for presentation to physicians.

53.     ACELL provided another original case study to sales representatives in the DropBox account which involved using Surgical Matrix PSMX off-label on an extremity.  The device used is referred to as a "six-layer MatriStem xenograft."

54.     As has been done with all of the case studies provided by ACELL to sales representatives as marketing materials for surgeons, the names of the original devices have been altered to a more generic term in order to meddle or confuse the different products and approvals.

55.     The actions of ACELL in misrepresenting intended or approved uses for its products amounts to misbranding.

**ACELL used the "Bladder Matters" conference call to disseminate off-label messaging and unlawful sales tactics**

56.     As referenced above, "Bladder Matters" is the name of an ACELL company conference call that was usually held on Friday afternoons.

57.     The central purpose for the "Bladder Matters" calls was to train sales representatives on how to promote MatriStem products by providing focused messaging from corporate management.

58.     The call was usually hosted by Director of Sales Tres Riley and also included regional managers, area managers, product managers, upper management, the marketing department and sales representatives.

59.     These calls generally began with Tres Riley inviting a sales representative to discuss successful strategies that they have implemented in their own territory and suggesting that these techniques would work anywhere.   A large majority of the discussions were aimed at directing the sales representatives to promote MatriStem products for off-label uses.

60.     The email announcing the Bladder Matters calls usually included a new case study, protocol or presentation that would be listed the following day on the ACELL DropBox folder for the sales representatives to use for promotional purposes.   There were many calls that not only trained representatives on the off-label use of MatriStem products but also recommended ways to increase the cost of the case that had nothing to do with patient care.

61.     The Bladder Matters conference call held on June 22, 2012, is a prime example of the way ACELL trained sales representatives on how to sell MatriStem products for unapproved uses.   On this call, Tres Riley instructed sales representatives on procedures to reinforce the suture/staple line in an anastomosis, which is an off-label use of MatriStem products.   Tres Riley openly admits that the use of "powder" (MatriStem MicroMatrix) is "off-label," but he also

insists that the MatriStem Surgical Matrices RS, PSM and PSMX are indicated for this procedure. There are no MatriStem products indicated for staple/suture line reinforcement.

62.     The direct instruction from corporate management is further elaborated in a 6/21/2012 email from Tres Riley to the sales force, upper management (CEO Jim DeFrancesco and President Rodney Bosley), marketing, product managers, and sales representatives.  In the email, Tres Riley explained that there is: *"[n]othing like a good success story…identify the complication and sell to the complication.   By definition, Surgical Oncology has a high complication rate.  Christina Citino and Jeff Klecatsky booked a bundle of business by selling distal pancreatectomies and Abdominoperineal Resections. These surgeons are the elephants we all dream for.  Join us tomorrow and make some money!!!"*

63.     In addition to training ACELL sales representatives on how to promote ACELL products for off-label indications, Bladder Matters calls also provided training to sales representatives on methods to increase the cost of cases by only disclosing larger sizes or thicker versions of MatriStem products.

64.     MatriStem MicroMatrix comes in 20mg, 30mg, 60mg, 100mg, 500mg, and 1000mg sizes.

65.     Sales management recommended that sales representatives only disclose that 500mg and 1000mg were available, which would increase the cost of the case by thousands of dollars. For example, if a procedure only needed 50mg the facility could easily utilize the 20mg and 30mg with no waste or the 60mg with minimal waste.  However ACELL instructed its representatives to convince purchasers that only 500 and 1000mg were available, thus resulting in extensive waste.

66. Sales management ignored previous recommendations made by product managers regarding choosing the milligram size of MatriStem MicroMatrix based on the wound size and depth. Instead, sales management recommended that sales representatives sell the larger sizes of MatriStem MicroMatrix in order to increase sales and ignored the recommendations on what was appropriate for the patient.

67. This strategy not only increased the cost of the cases, it also misled health care providers about available product options. This strategy made it impossible for health care providers to choose the most appropriate and cost-effective products for the patients.

68. During a Bladder Matters conference call, ACELL sales representative Colin Nelson delivered a presentation entitled "Capitalizing and Embracing MicroMatrix: Insights into Growing your Business."

69. The electronic file for Colin Nelson's presentation is called "Micromatrix_PPT Nelson.pdf" and was distributed to the ACELL sales representatives via ACELL company email from Sales Director Tres Riley. The presentation included a "new strategy" which recommended that sales representatives "set the precedent" for surgeons by recommending only using larger sizes of MatriStem MicroMatrix in order to increase the cost of the cases and increase sales.

70. Colin Nelson's presentation demonstrates the corporate philosophy of profit and increasing sales as priorities over patient care. The company sponsored strategy was designed to "make small cases worth your time." It demonstrates a case where the cost of the case can be increased from $1,070 to $2,225, more than doubling the cost with no patient benefit. The choice of product in this presentation has nothing to do with choosing a product based on the size

or depth of the wound, but rather, the focus of the new strategy is on increasing sales for ACELL and increasing the cost of the cases.

71.     ACELL prepared and distributed a chart or guide called "MatriStem Square Centimeter and Milligram Conversion" which stated the most appropriate amount of milligrams of MatriStem MicroMatrix (aka "powder") in relation to centimeters of wound size. This guide had been previously provided to ACELL sales representatives via the ACELL DropBox account as a guide to determine the most appropriate size of MatriStem MicroMatrix to use according to wound size. However, the guide was considered obsolete under the new strategy where the focus was on sales and profits rather than on the patient outcomes.

72.     Another Bladder Matters call, focused on increasing the cost of cases by misbranding MatriStem products and deceiving Surgeons and hospital staff, was held on June 1, 2012.

73.     In a May 31, 2012 email, Director of Sales Tres Riley announced the June 1, 2012 Bladder Matters, and sent an attachment entitled "ACell Micromatrix Training Presentation_June 2012.pdf." This presentation was put together by ACELL Regional Manager Kay Lay and Area Manager Geoff Hopkins, who hosted the June 1, 2012 Bladder Matters conference call.

74.     The presentation was posted to the ACELL DropBox account, and was listed under the file name "06-01-12 Powder to the Top- Sell it by the Gram." Tres Riley made this call mandatory for sales representatives who had not met their sales quota.

75.     During the June 1, 2012 call, Geoff Hopkins presented on how to increase sales of MatriStem products by utilizing MatriStem MicroMatrix as an "easy foot in the door product." During the call, Geoff Hopkins recommended promoting MatriStem MicroMatrix for numerous off-label indications, including utilizing MatriStem MicroMatrix in internal procedures such as

"fempops," and using it at the incision and then closing the incision over the MatriStem MicroMatrix.

76.    MatriStem MicroMatrix is for topical use only, and using it internally or closing over the product is off-label.  Geoff Hopkins said that these cases are "easy and specific cases to ask for." Although Tres Riley stated that he needed to qualify that these procedures were off-label, he then allowed Geoffrey Hopkins to repeat numerous times the recommendations that "asking docs for fempops is an easy way to pick up cases."   Underperforming sales representatives were strongly encouraged to utilize this strategy.

77.    In addition to the internal cases, Geoff Hopkins also discussed off-label cases containing exposed tendon.  There are several competing products which have been clinically tested and are in fact approved for tendon wrapping or repair; however no ACELL product is approved for tendon use.  ACELL encouraged its Sales Representatives to make comparisons to these competing products in order to create the impression that ACELL shared their approvals.

78.    Geoff Hopkins also recommended that after starting with MatriStem MicroMatrix and MatriStem Wound Matrix, you can "move into thicker sheets." These "thicker sheets" are referring to MatriStem Surgical Matrices RS, PSM and PSMX and are not indicated for external wounds or for use on extremities.

79.    Geoff Hopkins shares his "final tip," which is to "sell it by the gram and not the milligram."  Geoff recommends to "only do half grams or grams" because "surgeons are more likely to ask for more powder."

80.    ACELL Director of Sales Tres Riley reacted to this recommendation to misbrand MatriStem products and to deceive surgeons by saying, "That's perfect, 'sell it by the gram,'

that's great!"  This new strategy was summarized in Geoff Hopkins' and Kay Lay's presentation. This peddler's sleight of hand confused health care providers as to the available product options.

**ACELL Management Instructed Employees to Promote Products for Off-Label Uses**

81.     In addition to home office training and Bladder Matters conference calls, ACELL sales management routinely encouraged and instructed sales representatives via email to sell MatriStem products for off-label indications.

82.     Matthew Berryman was asked by Relator which products are appropriate on a lower extremity wound, and he recommended MatriStem Surgical Matrix PSM and MatriStem Surgical Matrix PSMX, which are both off-label for use on extremities and are not indicated for wound care.  This is evidenced in an 11/9/2011 email response from ACELL Regional Manager Matthew Berryman.

83.     In another email on 1/23/2012, Darren Doerr recommends that his sales representatives ask for the off label procedures, including tendon wraps, wounds with exposed bone or tendon, breast reconstruction, fistula repair, scar revisions and using "powder" (MatriStem MicroMatrix) under a skin graft.  All of these procedures are unapproved or off-label for MatriStem products.

84.     No MatriStem products have an indication for soft tissue repair except for the Surgical Matrices RS, PSM and PSMX, and then only in the urological, gynecological and gastroenterological anatomies.

85.     Both Matthew Berryman and Darren Doerr repeatedly informed Relator that the MatriStem Surgical Matrices RS, PSM and PSMX had a "soft tissue repair" indication that enables the MatriStem Surgical Matrices to be used in a broad spectrum of surgical procedures, which includes wound care.

86.     A 3/12/2012 email from Area Manager Darren Doerr to Jim Krause, Materials Manager at Orlando Health System was forwarded to ACELL sales representatives in Florida.  In the email, Darren referenced numerous attachments and recommended using the "Leave Behinds" for surgeons so that they can physically circle a case where they would like to start using ACELL products.

87.     In addition, the email contained other attachments which recommended promoting MatriStem for numerous off-label indications, including reinforcing an anastomosis (reinforce the suture/staple line), use on exposed tendon and bone, fistula repair, etc.

88.     In one of the attachments, Darren provided a "learning moment" on a Whipple procedure where MatriStem products are utilized to reinforce an anastomosis, which is off-label. He also included the "Surgical Oncology Presentation" that demonstrates the protocol for off-label use of MatriStem in suture/staple line reinforcement.

89.     ACELL Product Manager Arjun Ishwar developed the presentation and distributed to Area Manager Darren Doerr for promotional purposes and to be distributed to the sales representatives.

90.     An attachment entitled "Head and Neck" was attached to an email on 9/4/2012 from Darren Doerr to all ACELL, Inc. Florida Sales Representatives.  Darren Doerr included the case presentation as an attachment that he received from Jon Fouse.  Darren mentioned that "this has not gone through marketing and is not for distribution….just put on iPads for example case….wink wink!"

91.     This type of attitude was typical of Darren Doerr and ACELL Sales Management and other ACELL departments in that they routinely marketed without regard for regulatory

approvals and presented non-approved marketing pieces with no regard for FDA guidelines or patient safety.

92.     Tres Riley recommended to the ACELL sales team that a video showing experimental uses of MatriStem products in order to regrow muscle tissue be shown to customers. MatriStem products do not have an indication to regrow muscle.  In addition, this video is an unapproved marketing piece.

93.     Tres Riley and ACELL, Inc. sales management, marketing and product managers routinely recommended to sales representatives to use videos from 60 Minutes, Oprah Winfrey and the New York Times to market MatriStem Products.

94.     The above examples are but a sample of the scheme and culture endemic in ACELL to sell without regard for regulatory approval, proper vetting, concern for approvals and /or labeling.

95.     Trent O'Brien is an ACELL sales representative in Texas who shared the same concerns that Relator had regarding the off-label promotion at ACELL.  Trent O'Brien received "cheat sheet" protocols from ACELL Regional Manager Kay Lay.  These protocols identify a host of unapproved procedures and the ACELL product which should be marketed.  These protocols were used to promote ACELL products.  Kay Lay would promote these off label uses consistently in front of surgeons and urged sales representatives to sell MatriStem products for these off-label indications.  In addition, Trent informed Relator that Area Manager Geoff Hopkins consistently promoted MatriStem products off-label, and asked surgeons to "be creative" when thinking of uses for MatriStem products.

**ACELL Sponsored Educational Dinner Programs and Medical Industry Meetings in Order to Off-Label Market Through Straw Men or Proxies.**

96.     On August 16, 2012, Relator arranged an ACELL sponsored educational speaker program at Ruth's Chris Steakhouse in Winter Park, Florida.  The speaker at the program was a plastic surgeon from South Florida named Dr. Tracey Stokes.

97.     Prior to the meeting, Relator asked Area Manager Darren Doerr and Dr. Stokes' sales representative, Allison McMahon, if Relator could see Dr. Stokes' presentation for the August 16, 2012 speaker program.

98.     Allison McMahon and Darren Doerr both told Relator that ACELL could not tell Surgeons what the Surgeons can talk about in their presentations.  Relator later learned that this guidance from Darren Doerr was completely untrue, since the Surgeons' presentations have to be approved by the sponsoring company to ensure that the material adheres to marketing guidelines.

99.     During the educational dinner, Dr. Stokes presented on numerous off-label indications for MatriStem, including utilizing MatriStem products for the off-label indication of Breast Reconstruction Surgery.  In addition, Dr. Stokes presented cases that included utilizing MatriStem Surgical Matrices RS, PSM and PSMX on external wounds, which is considered off-label for these devices.

100.    Relator expressed concern to Darren Doerr regarding the off-label promotion for breast reconstruction during the August 16, 2012 speaker program by Dr. Tracey Stokes.  Darren Doerr insisted that Dr. Stokes can speak about what she wants because, "that is her experience with our product."

101.    ACELL knew Dr. Stokes was going to specifically reference off-label uses.  In fact, it was one of the main reasons ACELL selected her to speak.

102.   Dr. Strokes was thereafter placed on the Speakers' List for ACELL.  Pictures and
case studies of her off-label uses of MatriStem products, including Breast Reconstruction,
MatriStem Surgical Matrices in external wounds, and other off-label uses, were published on the
ACELL DropBox account for access by sales representatives for use in promoting MatriStem
products.

**ACELL Company Sales Meetings and National Meetings with Sales Management Were
Rife with Off-Label Directives**

103.   At the ACELL National Sales Meeting August 10-12, 2012, in Las Vegas,
Nevada, numerous presentations were given to sales representatives on off-label promotion
of MatriStem products.

104.   Dr. James Elipas, a podiatrist, presented numerous cases utilizing MatriStem
Surgical Matrices on external wounds, which is off-label for these devices.   In addition,
numerous sales representatives gave presentations on their best sales practices, many of
which included the off-label uses and promotion of MatriStem products.

105.   During the National Sales Meeting, the first segment of the meeting was
reserved for the President of ACELL, Rodney Bosley, to speak where he discussed the
indications of the MatriStem products. Despite the fact that ACELL Sales Management,
including Area Manager Darren Doerr and Regional Manager Matthew Berryman, repeatedly
ensured sales representatives that MatriStem has a "soft tissue indication" which allows
MatriStem Surgical Matrices to be utilized on external wounds, Rodney Bosley stated that
the MatriStem Surgical Matrix devices were only to be used in the trunk and specifically in
the urological, gynecological and gastroenterological anatomies.

106.   Mr. Bosley stated that any use of MatriStem Surgical Matrices on the head or
on an extremity is off-label.  Mr. Bosley then acknowledged that ACELL is pursuing these

indications (for external wounds) for the MatriStem Surgical Matrices, but gave no specifics as to where the MatriStem Surgical Matrices were in the approval process. Mr. Bosley told the ACELL sales representatives that they should "be careful when promoting MatriStem Surgical Matrices" for external wounds on extremities because this is an off-label use, demonstrating his knowledge and acceptance of the rampant off-label promotion and misbranding occurring at ACELL.

107. On the second day of the National Sales Meeting in Las Vegas, Nevada, ACELL Sales Representatives and Sales Management broke up into groups by Regions to discuss business plans and strategic sales directions to implement following the meeting. When the topic of Rodney Bosley's comments on indications were brought to the attention of Regional Manager Matthew Berryman and Area Managers Darren Doerr and Shawn Shugars, all three members of sales management denied that Rodney Bosley was correct when Mr. Bosley stated that promoting MatriStem Surgical Matrices externally and outside of the urological, gynecological and gastroenterological anatomies was off-label.

108. Relator and fellow sales representatives John Deeds and Andrew Ferrante tried to express their concerns that the MatriStem Surgical Matrices are not indicated to be used outside of urological, gynecological and gastroenterological anatomy. In response, Regional Manager Matthew Berryman, Area Manager Shawn Shugars and Area Manager Darren Doerr flatly refused to acknowledge the topic and denied that Mr. Bosley made such a remark.

109. Area Manager Shawn Shugars evidenced his disdain for this line of questioning and told the Relator and other sales representatives that they were incorrect in what they had heard and insisted that they had misunderstood Mr. Bosley.

110.    Shawn Shugars then went on to state that he and his team like to talk about and promote "subcutaneous diseases," which is not an indication for any MatriStem products. This was another prime example of Sales Management misrepresenting the indications of MatriStem products in order to have the sales representatives promote MatriStem products for off-label indications without the sales representatives even being aware that they are promoting off-label.

111.    During Relator's entire tenure at ACELL, sales management consistently misrepresented the indications for MatriStem products to sales representatives.  In addition, sales management, the training department, the marketing department and product managers consistently misled sales representatives to promote MatriStem products off-label often without the sales representatives being aware that they are doing so.

**Unfair and Deceptive Comparisons to Approved Products**

112.    In an attempt to gain market share, ACELL instructed and trained its sales representatives to compete against rival products even though ACELL did not have the same FDA approvals for their products.

113.    ACELL provided sales representatives with a comparison spreadsheet to use in marketing ACELL products against the competition.  The spreadsheet encouraged sales representatives to, and relator witnessed ACELL employees firsthand, make unfair product comparisons to products which were FDA approved for a variety of indications for which ACELL products were not approved.

114.    Sales representatives were instructed to, and actually did make direct comparisons to products which were approved for a variety of indications knowing fully well that the product they were referencing or promoting was not comparable.  These comparisons

created confusion in the approved indications for ACELL products and amount to misbranding.

**ACELL Allowed Sales Representatives to Provide Illegal Kickbacks in Order to Increase Sales**

115.   ACELL Sales management provided direction to give away MatriStem products for free in settings where the MatriStem products are not reimbursed in order to secure business and cases in settings where the MatriStem products are reimbursed.

116.   Kyle Brandt is a sales representative for the Surgeon Dr. James Elipas, who presented on using MatriStem products in Podiatry cases at the ACELL 2012 national Sales Meeting.   Dr. Elipas was using the MatriStem Surgical Matrices on wounds, which is off-label for these devices.   The Relator asked Sales Representative Kyle Brandt how he and Dr. Elipas were able to use the MatriStem Surgical Matrices in an outpatient setting on wounds, because the hospitals that the Relator called on had concerns over outpatient reimbursement.

117.   Kyle informed Relator that Dr. Elipas bills for convenience kits, which is a pack that consists of a group of several separately packaged MatriStem products, and Dr. Elipas takes the unused, unopened product out of the hospital operating room and hospital setting to use in his office.   Relator asked Kyle if the hospital knew about this, and Kyle responded, "Well, he is one of their busiest surgeons."

118.   Kyle did not answer the question about if the hospital knew that Dr. Elipas was billing for the product in the hospital operating room and taking the unused, unopened product out of the operating room and hospital, which is fraudulent.

119.   Geoff Hopkins, who is now an Area Manager in Texas, was accused of supplying Surgeons with a percentage of sales kickback in exchange for the surgeons using MatriStem products.

120.   Andrew Ferrante was an ACELL Area Manager at the time he became aware of these allegations.  Andrew told Relator that when these accusations went to the Director of Sales Tres Riley, Mr. Riley did not investigate the situation or the accusations because Geoff Hopkins had good sales numbers.  Geoff Hopkins received numerous awards months later at the National Sales Meeting in August 2012 along with Kyle Brandt.

121.   The above examples of the "get the sales anyway you can" culture at ACELL, depict a company which pays no attention to following ethical or legal guidelines.

**ACELL Sales Management Trained Sales Representatives to Give Away ACELL Products in Settings Where ACELL Products Are Not Reimbursed.**

122.   In most areas of the country, MatriStem products are not separately reimbursed in outpatient settings, including surgery centers, wound clinics, or physician offices.  However, inpatient settings do provide for reimbursement for ACELL products.

123.   In order to get around this obstacle, Regional Manager Matthew Berryman and Area Manager Darren Doerr instructed sales representatives to give away MatriStem products for free if the products were being used for follow-up procedures for patients who initiated therapy in a hospital inpatient setting.

124.   Matthew Berryman and Darren Doerr insisted that this practice is legal as long as they inform the surgeon that he is not allowed to bill Medicare or insurance companies for the free product but he is able to bill for the procedure (application).

125.   ACELL representatives encouraged health care providers to utilize their products in inpatient settings so they would be reimbursed.

**Relator's Conversations with ACELL Management Regarding Allegations**

126.   In October 2011, Dr. Larry Suecof requested to trial ACELL Plastic Surgery Matrix (now called MatriStem Surgical Matrix PSM) and Plastic Surgery Matrix XS (now

called MatriStem Surgical Matrix PSMX) at Florida Hospital in Orlando.  Per ACELL's direction from new hire training and sales management, Relator offered trial cases in Dr. Suecof's office with the understanding that if the cases in the office went well, then Dr. Suecof would request the MatriStem products in the hospital and would use the MatriStem Surgical Matrices and other MatriStem products in the hospital operating room.

127.    After a few weeks of trial cases, Dr. Suecof requested the MatriStem Plastic Surgery Matrix (now called MatriStem Surgical Matrix PSM) and the MatriStem Plastic Surgery Matrix XS (now called MatriStem Surgical Matrix PSMX) to be brought into Florida Hospital South for a sample case.

128.    When Relator followed up with the hospital regarding Dr. Suecof's request for the MatriStem products, the Florida Hospital Orlando Clinical Resource Manager, Teri Wedlund, BSN, approached him to confirm which products he was bringing for Dr. Suecof's podiatry case.

129.    Ms. Wedlund took Relator into her office and looked at a document that Relator had previously emailed her which listed the MatriStem products and their corresponding 510K's and indications.  Ms. Wedlund stated that the MatriStem Plastic Surgery Matrix (now called MatriStem Surgical Matrix PSM) and the MatriStem Plastic Surgery Matrix XS (now called MatriStem Surgical Matrix PSMX) were indicated for "urological, gynecological and gastrointestinal anatomy" and that the MatriStem Plastic Surgery Matrix products were therefore off-label for uses in Podiatry.  Ms. Wedlund then denied Relator's access to the operating room and refused to order the products because the MatriStem Surgical Matrix products were not indicated for podiatry or wound care procedures.

130.    Relator immediately went outside and either emailed or called ACELL Regional Manager Matt Berryman, ACELL Product Manager Arjun Ishwar and ACELL Regional Manager Mike Manning to inform them that Ms. Wedlund had told Relator that the MatriStem Plastic Surgery Matrix and the MatriStem Plastic Surgery Matrix XS were off label devices for Podiatry and wound care. Instead of getting the response that the Relator expected, which was that Ms. Wedlund was misinterpreting the MatriStem products 'indications, Arjun Ishwar replied in an email to Relator, "Sorry, dude. She's right."

131.    Mike Manning's response to Relator over the phone was, "Wow, I can't believe she actually went through each product and their indication," and he admitted that Teri Wedlund, BSN was correct. Matthew Berryman responded over the phone by stating, "I can't believe that a nurse can turn away a product as innovative as MatriStem,"

132.    After these conversations, Relator was still instructed by Matt and Darren that the "soft tissue repair" indications allowed ACELL's MatriStem Surgical Matrix products to be used and promoted for wound care. Matt and Darren consistently reassured the Relator that "we (ACELL) are doing nothing wrong" whenever questions or concerns arose over the off-label promotion of MatriStem products.

133.    During 2012, Darren Doerr became the Area Manager for Florida and consistently pushed sales representatives to promote the fraudulent "soft tissue repair" indication, even though Darren Doerr stated in a conference call that ACELL is pursuing wound indications for the MatriStem Surgical Matrices and that ACELL should have the wound indications soon.

134.    Darren Doerr also stated that ACELL was planning to change the names of the MatriStem Surgical Matrix products to MatriStem "multi-layer wound sheet".

135.    ACELL's surgical products were listed on the agenda for a May 8, 2012 CMS
Meeting for the Healthcare Common Procedure Coding System (HCPCS) to obtain Q-Codes.

136.    Companies can only obtain Q-Codes if the product is indicated for that
procedure.

137.    In June of 2012, ACELL Reimbursement Specialist Tonya Genius informed
Relator that they could not get Q-Codes because Rodney Bosley and ACELL did not get wound
care indications for the MatriStem Surgical Matrix products, even though the Surgical Matrices
RS, PSM, and PSMX were presented to CMS as having those indications.

138.    An itinerary for this meeting in PDF format is available on the CMS website and
incorrectly states that the MatriStem Surgical Matrix products are indicated for wound care.
ACELL was trying to secure reimbursement for the MatriStem Surgical Matrix products in
procedures related to the application of a skin substitute for wound care by misrepresenting the
indications for the MatriStem Surgical Matrix products.

139.    During the National Sales Meeting in Las Vegas, Nevada in August 2012, CEO
Rodney Bosley was first on the itinerary and presented on ACELL's MatriStem indications.
He stated that the MatriStem surgical matrices were still not indicated for wounds or use on
extremities.  He also stated the use of the surgical matrices were limited to the "urological,
gynecological and gastrointestinal anatomy."

140.    In spite of this information, presentations at the National Sales Meeting
continued to focus on using the surgical matrices off-label for wound care.  Mr. Bosley even
asked Vice President of Sales Tres Riley if he would promote "powder" ("powder" is another
internal term used by ACELL to represent the MatriStem MicroMatrix, which is for topical use
only) for a hernia repair or closure, and Mr. Riley replied that he would still do so.

141.    On the second day of the meeting, the groups broke up into regions to talk about business plans.  When a sales representative asked Regional Manager Matthew Berryman if Geoff Hopkins is only using wound sheets and powder (MatriStem MicroMatrix) because those are the only products indicated for wounds, area managers Darren Doerr, Shawn Shugars and regional manager Matt Berryman acted like they did not know what the rep was talking about. The rep then pointed at Relator and said, "Murtaugh got turned away at a hospital because the surgical sheets are off-label."

142.    In addition to discussing the off-label use during the second day of the national Sales Meeting, another rep brought up information that was provided to Relator by Kyle Brandt. Kyle Brandt is a sales representative for the Surgeon Dr. James Elipas, who presented on Podiatry at the National Sales Meeting.  Dr. Elipas was using Surgical Matrices on wounds, which is off-label.

143.    Relator asked Kyle Brandt how he and Dr. Elipas were able to use the Surgical Matrices in an outpatient setting, because hospitals that the Relator called on had concerns over indications and outpatient reimbursement for MatriStem products when they were used for wound care.

144.    Kyle informed Relator that Dr. Elipas bills for convenience kits, which is a pack that consists of a group of several MatriStem products, and Dr. Elipas takes the unused, unopened products from the convenience kit out of the hospital operating room and the hospital setting to use in his office.

145.    Relator asked Kyle Brandt if the hospital knew about this practice of taking product that the hospital paid for out of the hospital, and Kyle responded, "Well, he is one of their busiest surgeons."  Kyle did not answer the question about if the hospital knew that Dr.

Elipas was billing for the product in the hospital operating room and taking the unused product out of the operating room and hospital, which is fraudulent.

146.   On May 7, 2012, Darren Doerr and Relator met with Florida Hospital Administrators, including Clinical Liaison Caroline Elizondo and Clinical Resource Manager Gina Mongiello.   During the meeting, Darren brought up numerous off-label indications, including tendon wraps and breast reconstructions.  After the meeting while waiting in front of the elevator, Relator expressed to Darren that he should not have brought up off-label indications, and Darren did not respond to the statement from the Relator.

147.   In addition to the off-label promotion and misbranding at this meeting, Darren also offered a way to get around the lack of reimbursement of ACELL products by offering the option for ACELL to "tear up the invoice" for each case at Florida Hospital that is denied by Medicare.  When Relator mentioned to Darren following the meeting that ACELL cannot tear up invoices due to an insurance denial because the practice is considered inducement, Darren also did not respond.

148.   On July 11, 2012, Relator had another meeting with ACELL National Accounts Manager Vaughan Dreary and ACELL Area Manager Darren Doerr along with the Florida Hospital Director of Purchasing Greg Edris and also the Florida Hospital System Surgical Services Clinical Nurse Manager Kathy Scott, BSN.

149.   During the meeting, Darren Doerr presented numerous off-label uses, both verbally and in a PowerPoint presentation, including breast reconstruction and tendon wraps. Immediately after the meeting with the Florida Hospital staff, Relator mentioned to Darren that Darren should not have brought up off-label indications and Darren's response was, "I was only telling them where it is used."

150.    On October 24, 2012, Darren Doerr contacted Relator via cell phone and Darren asked why Relator's sales numbers were down.  Relator explained to him that the products are not indicated for the procedures that ACELL is promoting them for and that the MatriStem products are not reimbursed in the state of Florida.  Relator also informed Darren that customers had asked if ACELL's MatriStem surgical matrices were indicated for wounds and Relator responded to the customers with the answer "No, we do not have wound care indications."  Darren replied to Relator, "Why didn't you bring up soft tissue repair?"  Relator again informed Darren that the indication of "soft tissue repair" is not an actual indication and Relator stated that he did not feel comfortable selling the MatriStem surgical matrices for wound care.  Darren Doerr's response to Relator was, "Oh, so NOW you don't feel comfortable?"  As usual, Area Manager Darren Doerr did not address Relator's concern that the sales direction that Relator was given is to sell MatriStem products for numerous off-label indications.

151.    On November 12, 2012, Area Manager Darren Doerr drove from Jacksonville, FL to Orlando, FL attend a lunch that Relator had scheduled at Dr. Freeland and Dr. Padron's office in order to introduce the MatriStem products to the surgeons.

152.    Prior to the lunch, Relator told Darren that Relator only wanted to market MatriStem products on label, and that he ONLY wanted to sell the MatriStem Wound Matrix and MatriStem MicroMatrix for wounds.

153.    Relator also stated that if a surgeon asked about Surgical Sheets, Relator wanted to inform each surgeon that these products were off-label for wound care.  Darren responded by saying that we (MatriStem) do have wound indications for the MatriStem surgical matrices, even though the MatriStem Surgical Matrices are not indicated for wounds.  Darren said that we (MatriStem) are indicated for esophageal reconstruction, hernia repair, pelvic floor repair

and soft tissue repair and that the surgeons are able to use the surgical devices in wounds because that is the surgeons' choice.

154.    After this conversation, Darren began all conversations with the surgeons attending the lunch by holding up a piece of MatriStem Surgical Matrix PSMX and demonstrating off-label cases where MatriStem Surgical Matrix products were utilized in wound care.

155.    ACELL Regional Manager Matthew Berryman and ACELL Area Manager Darren Doerr have consistently informed ACELL sales representatives in addition to Relator that sales representatives were allowed to give away product for free to surgeons for non-reimbursable procedures in order to obtain business on reimbursed products or procedures where reimbursement was not an issue.

156.    Relator has been instructed and trained on the use and billing of MatriStem products that is neither ethical nor legal.  Numerous times, when Relator approached Darren Doerr and other members of sales management to discuss the off-label marketing of ACELL products and other unethical and possibly illegal matters, Darren Doerr, Matthew Berryman and sales management have called Relator "negative" and failed to address his concerns.

**ACELL Devised the DRG Strategy to Increase Costs per Procedure**

157.    In addition to the above, ACELL executed a scheme known as the DRG strategy.  The DRG strategy was an organized campaign to convince medical facilities and health care providers to utilize ACELL products in unapproved applications in order to allow the facility to charge for a more expensive DRG or diagnoses related group.

158.    The company prepared a DRG Strategy document and distributed as a training update to sales representatives.

159. Coupled with the quid pro quo promises of free product for outpatient settings or tearing up invoices which are denied, the DRG strategy resulted in increased costs to government funded health programs by incentivizing providers to undertake more expensive procedures.

## V. KICKBACKS

160. The federal anti-kickback statute, 42 U.S.C. §1320a-7b(b) (the "AKS"), expressly prohibits any individual or entity from offering, paying, soliciting or receiving any "remuneration," which "include[s] any kickback, bribe, or rebate," to "any person to induce such person" to purchase or recommend a drug or service that is covered by Medicare or Medicaid.

161. In that regard, to qualify for most Medicare and Medicaid payments, health care providing facilities must certify that they are complying with the AKS.

162. The AKS, 42 U.S.C. §1320a-7b(b), arose out of congressional concern that remuneration given to those who can influence health care decisions would result in the provision of goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect patient and federal healthcare programs, including Medicare and Medicaid, from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.

163. First enacted in 1972, Congress strengthened the Statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Publ. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. §1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub. L. No. 100-93.

164.    The AKS makes it illegal for individuals or entities to "offer or pay any remuneration, including any kickback, bribe, or rebate... to any person to induce such person ... to purchase, ... order, ... or recommend purchasing ... or ordering any good ... or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. §1320a-7b(b)(2).

165.    The providing of free or discounted products by a medical device company to health care providers in order to induce them to utilize products in a reimbursed setting or in order to allow the health care provider to undertake and bill for a more expensive procedure violates this statute.

166.    Violation of the AKS is a felony punishable by fines and imprisonment, and can also result in exclusion from participation in federal health care programs. 42 U.S.C. §1320a-7b(b)(2) and 42 U.S.C. §1320a-7(b)(7).

167.    ACELL's actions resulting in the submission of false claims to government insurance plans as well as false certification of compliance with the AKS laws. Falsely certifying compliance with the Anti-Kickback Statute in connection with a claim submitted to a federally funded insurance program is actionable under the FCA.

168.    As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, 6402(f), 124 Stat. 119, codified at 42 U.S.C. §1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

## VI.    MISBRANDING

169.    FDA approved devices are "misbranded" if their labeling does not bear "adequate directions for use." 21 U.S.C. §352(f).

170.    "Adequate directions for use" are limited by regulation to a product's "intended use." 21 C.F.R. §801.5.

171.    "Intended use" "may change" if "the article is . . . offered and used for a purpose for which it is n[ot] labeled." Id.

172.    Intended use is defined as:

*The words intended uses or words of similar import in §§801.5, 801.119, and 801.122 refer to the objective intent of the persons legally responsible for the labeling of devices. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the devices, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses. But if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put.*

21 C.F.R. §801.4

## VII.    THE FALSE CLAIMS ACT

173.    The FCA, 31 U.S.C. §§ 3729-33, provides for the award of treble damages and civil penalties for, inter alia, knowingly submitting or causing the submission of false or fraudulent claims for payment to the United States Government and for making or using false statements material to false or fraudulent claims paid by the United States.   31 U.S.C. §§ 3729(a)(1)(B) (West 2012).   The FCA provides, in pertinent part, that:

*(a)(1) any person who – (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;  (B) knowingly makes, uses,*

*or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.*

*(b) For purposes of this section, (1) the terms "knowing" and "knowingly" mean – (A) that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud . . . .31 U.S.C. §3729 (West 2012).*

174.    The standard of proof under the FCA is preponderance of the evidence.   31 U.S.C. §3731(d) (West 2012).

**Medicare**

175.    Medicare is a federally funded program, 42 U.S.C. §1395 et seq., which provides medical care based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.

176.    Overall responsibility for the administration of Medicare, as authorized by 42 U.S.C. §1395, et seq., (hereafter "Social Security Act or SSA"), resides with the Secretary of the Department of Health and Human Services (hereafter "HHS").

177.    Within HHS, the responsibility for administration of the Medicare program has been delegated to the Centers for Medicare and Medicaid Services (hereafter "CMS").  Medicare provides two basic types of coverage – hospitalization insurance (commonly known as Medicare Part A) and medical insurance (commonly known as Medicare Part B).

178.    Part A hospital insurance provides coverage for inpatient hospital charges, post-hospital extended care for 100 days following hospital discharge, and hospice care.  Part B

medical insurance covers physician services, home health services, most skilled nursing home services, and other non-hospital related medical services. 42 U.S.C. §1395k; 42 C.F.R. §410.10.

179.    The federal government provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS.  To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare Administrative Contractors (MACs).  42 U.S.C. §1395u. MACs are responsible for processing the payment of Part B claims to providers on behalf of CMS. *Id.*

180.    Providers claim Medicare Part B reimbursement from MACs pursuant to written provider agreements.  MACs receive, process, and pay or reject those claims according to Medicare rules, regulations, and procedures.

181.    Medicare covers services that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation, for example, physician's orders, physician's review of work, and other pertinent documentation corroborating the treatment administered.  42 U.S.C. §1395 y(a)(1)(A).

182.    Absent certain exceptions, Medicare Part B does not cover, and providers agree not to submit claims for, services provided that are not necessary, not appropriately administered, or not properly documented.

183.    With limited exception, local coverage determinations that define coverage of the treatment of skin grafts, etc. preclude payment for ACELL products.

**Tricare**

184.    TRICARE is the federal health care medical benefits program, formerly known as CHAMPUS, established by Congress for active duty and retired members of the Uniformed Services and their dependents and administered by the Department of Defense. TRICARE is

funded through several appropriations, including the annual National Defense Appropriations Acts and the Department of Homeland Security.

185.    TRICARE regulations state that "CHAMPUS can only cost-share medically necessary supplies and services. Any . . . device, or medical treatment or procedure, the safety and efficacy of which have not been established, as described in this paragraph (g)(15), is unproven and cannot be cost-shared by CHAMPUS . . . [A] device . . . is unproven . . . [i]f the drug or device cannot be lawfully marketed without the approval or clearance of the United States Food and Drug Administration (FDA) and approval or clearance for marketing has not been given at the time the drug or device is furnished to the patient." 32 C.F.R. §199.4(g)(15)(i)(A).

**Medicaid**

186.    The named States provide medical assistance and other related services, as outlined by Title XIX of the Social Security Act, to low income families, children, and pregnant women as well as other persons determined to be categorically eligible for such benefits.

187.    The States make payments for various categories of medical services rendered on behalf of its recipients.  These services include, but are not limited to, outpatient hospital services and physician services.

188.    The States contract with a Fiscal Agent for processing and paying Medicaid claims.  Claims submitted to Fiscal Agents for Medicaid reimbursement are to be completed and paid in accordance with State law and Medicaid rules and regulations.  States and their Fiscal Agents distribute Medicaid rules and regulations to providers participating in the Medicaid program.

189.     Medicaid will only pay for medical services when those services are medically necessary for the treatment of an injury, illness, or disease within the scope of the practice of medicine or osteopathic medicine as defined by state law.

**Federal Employees Health Benefit Program (FEHBP)**

190.     The Federal Employees Health Benefit Program is a government administered health care insurance program for employees of the federal government.  It contains numerous coverage options similar to private health insurance.

191.     False claims submitted to the agents or third party contractors of the FEHBP are subject to the False Claims Act.

## VIII.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. §3729(a)(1)(A))

192.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 200 of this Complaint as if fully set forth herein.

193.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, ACELL knowingly caused the submission of false or fraudulent claims for the use of MatriStem products to government health care programs, including Medicare, Medicaid, Tricare, FEHBP, and CHAMPUS.

194.     ACELL has knowingly presented or caused to be presented false or fraudulent claims to Federal and state healthcare programs for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

195.     The United States Government, or its authorized agent, paid the false and/or fraudulent claims.

196.    By virtue of the false or fraudulent claims Defendant knowingly caused to be presented, the United States Government has suffered substantial monetary damages.

## SECOND CAUSE OF ACTION
(False Claims Act: Making or Using False
Record Statement to Cause Claim to be Paid)
(31 .S.C. §3729(a)(1)(B))

197.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 191 of this Complaint as if fully set forth herein.

198.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant ACELL knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the Government, or (b) material to false or fraudulent claims, in violation of 31 U.S.C. §3729(a).  The false records or statements included, but were not limited to, ACELL's deceptive promotional practices and misbranding of off-label products which caused healthcare providers to submit false claims to Federal and state healthcare programs for payment or approval."

199.    In addition, providers are required to submit annual cost reports to the Centers for Medicare and Medicaid Services, the agency that administers federal healthcare programs. 42 C.F. R. 413.20(b). Each cost report includes a certification attesting to compliance with healthcare laws and regulations, including anti-kickback provisions.  By engaging in bribes and kickbacks, ACELL knowingly caused the submission of false or fraudulent claims for payment to the United States, and knowingly caused the use of false statements, resulting in the payment of false or fraudulent claims. 31 U.S.C. §3729(a)(1) and (2).

200.    By virtue of the false records or statements Defendant made or caused to be made, the United States Government has suffered substantial monetary damages.

## THIRD CAUSE OF ACTION
((False Claims Act: Presentation of False Claims)
(31 U.S.C. §3729(a)(1)(A))
& Anti-Kickback Statute)

201.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 191 of this Complaint as if fully set forth herein.

202.    Relator seeks relief on behalf of the United States and the state of Florida against ACELL under Section 3729(a)(l) of the False Claims Act, 31 U.S.C. §3729(a)(l) (2000), and, as amended, 31 U.S.C. §3729(a)(1)(A).

203.    As a result of its offering and paying kickbacks to induce health care providers to purchase, order, or recommend the purchasing or ordering of ACELL products, in violation of the federal anti-kickback statute, 42 U.S.C. §1320a-7b(b), ACELL caused the health care providers to present claims for reimbursement to the United States that were false or fraudulent.

204.    Accordingly, ACELL knowingly caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(l) (2000), and, as amended, 31 U.S.C. §3729(a)(l)(A).

205.    By reason of the false or fraudulent claims that ACELL knowingly caused health care providers to present to the United States, the government has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## FOURTH CAUSE OF ACTION
## CONSPIRACY TO SUBMIT FALSE CLAIMS
## 31 U.S.C. §3729(a)(l)(c)

206.    Relator realleges and incorporates by reference paragraphs 1 through 191 as though fully set forth herein.

207.    Defendant ACELL conspired to defraud the United States by submitting false or fraudulent claims for reimbursement to the United States, acting through its programs, Medicare, Medicaid, FEHBP, and TRICARE, for money to which they were not entitled, in violation of 31 U.S.C. §3729(a)(3) (2006) and 31 U.S.C. §3729(a)(1)(C) (West 2012).

208.    As part of the schemes and agreements to obtain reimbursement from the United States in violation of federal laws, Defendant conspired with health care providers to file or cause to be filed billings for payment for services not supervised, duplicative and unnecessary services, services not rendered, and/or upcoded services, and to cause the United States to pay claims for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services when they were not so provided.

209.    By virtue of Defendant's conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## FIFTH CAUSE OF ACTION
## FLORIDA FALSE CLAIMS ACT

210.    Relator realleges and incorporates by reference paragraphs 1 through 191 as though fully set forth herein.

211.    This is a *qui tam* action  brought by Relator on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*

212.    Fla. Stat. §68.082(2) provides liability for any person who:

(a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

213.    Defendant violated Fla. Stat. §68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws and by virtue of ACELL's misbranding, providing kickbacks, and misrepresenting the approved uses or indications for ACELL products. Few of the claims submitted in connection with its conduct were even eligible for reimbursement by the government funded healthcare programs.

214.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendant's conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

215.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied and, upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendant's conduct.

216.    Had the State of Florida known that false representations were made to practitioners about the true state of affairs regarding the safety, efficacy, and approved uses of ACELL products, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

217.    As a result of Defendant's violations of Fla. Stat. §68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

218.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. §68.083(2) on behalf of himself and the State of Florida.

219.    Relator requests that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the State of Florida:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Florida;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to Fla. Stat. §68.085 and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action,
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

### SIXTH CAUSE OF ACTION
### MARYLAND FALSE HEALTH CLAIMS ACT OF 2010
### (Subtitle 6, §2-601 *et seq.*)

220.    Relator realleges and incorporates by reference paragraphs 1 through 191 as though fully set forth herein.

221.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act of 2010, Subtitle 6.

222.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

223.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

224.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal business practices.

225.    By reason of the Defendant's acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

226.    By virtue of the above-described acts, among others, Defendant ACELL did knowingly and willfully promote its products for unapproved uses from at least 2011 onwards.

227.    If the State of Maryland had known of the false statements disseminated by ACELL in support of its products, it would have refused to authorize payment for the products or for procedures performed using ACELL products.

228.    Upon information and belief, ACELL knowingly participated in a scheme to defraud the Maryland government while illegally and deceptively promoting ACELL products to further increase ACELL sales within the State of Maryland.

229.    The State of Maryland is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

230.     Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Maryland False Health Claims Act of 2010 on behalf of himself and the State of Maryland.

231.     Relator requests that this Court accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the State of Maryland:

> (1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendant's conduct;
> (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Maryland;
> (3) Prejudgment interest; and
> (4) All costs incurred in bringing this action.

To Relator:

> (1) The maximum amount allowed pursuant to the Maryland False Health Claims Act of 2010 and/or any other applicable provision of law;
> (2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
> (3) An award of reasonable attorneys' fees and costs; and
> (4) Such further relief as this Court deems equitable and just.

**TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

Dated this _____ day of June, 2013.

<div style="margin-left:40%">Respectfully submitted,</div>

MICHAEL S. ROTHMAN, ESQ.
District Court of Maryland Bar No. 14568
**Law Office of Mike Rothman**
401 East Jefferson Street, Suite 201
Rockville, Maryland 20850
(301)251-9660(Telephone)
(301)251-9610(Facsimile)

JOHN A. YANCHUNIS, ESQ.
Florida Bar No. 324681
jyanchunis@forthepeople.com
JAMES D. YOUNG, ESQ.
Florida Bar No. 567507
jyoung@forthepeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 One Tampa City Center, 7th Fl.
Tampa, Florida 33602
(813)318-5169 (Telephone)
(813)222-4793 (Facsimile)